# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-1617

_____

Margo Kronberg, as Personal Representative of the Estate of Joseph Kronberg, and
Margo Kronberg on Behalf of all the Heirs of Joseph Kronberg,

*Plaintiff - Appellant*,

v.

Oasis Petroleum North America LLC; RPM Consulting, Inc.; American Portable
Mini Storage, Inc.,

*Defendants - Appellees.*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: February 11, 2016
Filed: August 5, 2016

_____

Before SMITH and COLLOTON, Circuit Judges, and GRITZNER,[1] District Judge.

_____

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern
District of Iowa, sitting by designation.

COLLOTON, Circuit Judge.

Joseph Kronberg was electrocuted and died while working at an oil well as an employee of Nabors Drilling USA, LP. Mr. Kronberg's widow, Margo Kronberg, filed wrongful death and survival actions against Oasis Petroleum North America LLC, RPM Consulting, Inc., and others involved with the well, alleging that their negligence caused her husband's death. The district court[2] granted summary judgment for Oasis and RPM Consulting. Mrs. Kronberg appeals, and we affirm.

I.

Oasis engages in oil and gas exploration activities and acquires property rights to drill for the fuels. The company does not conduct drilling operations at its well sites. Rather, Oasis contracts with other entities that manage the day-to-day operations at its wells.

In June 2007, Oasis entered into a Master Service Contract with RPM Consulting. RPM Consulting agreed to provide Oasis with engineering support and subcontractors to oversee the drilling process and coordinate services needed to keep those sites operating efficiently.

Under the Master Service Contract, RPM Consulting assigned "company hands" to oil rigs operating at Oasis wells. A company hand is tasked with ensuring that the drilling process is progressing safely, efficiently, and according to the well plan. Company hands do not operate equipment or complete hands-on work. On behalf of Oasis, they supervise drilling and contract with third-party vendors for services needed at wells. RPM Consulting typically appoints two company hands to

---

[2]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

serve at each site, and one company hand is on duty at all times. While on duty, the company hand lives at the site, serving as the Oasis representative at the well. Each morning, the company hand on duty e-mails a progress report to several Oasis and RPM Consulting employees.

In early 2011, Oasis obtained the rights to drill for oil at the Ross 5603 well in Williams County, North Dakota. Oasis engaged Nabors Drilling to serve as the drilling contractor at the well. Oasis agreed to supply Nabors Drilling with a suitable location to drill the well. Nabors Drilling agreed to drill the well and to provide the rig and labor necessary to accomplish the task.

Nabors Drilling dispatched Nabors Rig 177 to the well. RPM Consulting assigned three subcontractors, including company hand Michael Bader, to the rig. Bader, through the separate entity of Mike Bader Consulting, LLC, had entered into a Subcontractor Agreement with RPM Consulting in February 2010.

Joseph Kronberg worked for Nabors Drilling on Nabors Rig 177. On the evening of May 9, 2011, Mr. Kronberg entered the Ross well's "change shack," a structure where Nabors Drilling employees changed into and out of their work clothes. An electrical cord running from a generator to the well site's transformer ran in front of the change shack. Someone had positioned a metal grate in front of the shack's entrance. Foot traffic near the shack had caused the electrical cord and metal grate to converge in a puddle of water, and the grate had punctured the cord. As Mr. Kronberg exited the shack, he stepped onto the grate and was electrocuted.

Although it is not clear who placed the grate in front of the shack, the grate previously had been located in another structure used by Nabors Drilling employees. It had been raining at the well for several days before the accident, and workers at the well suggested that the grate was set in front of the shack a few days earlier so that Nabors Drilling employees could remove mud from their boots. Bader, who was on

-3-

duty as company hand, filed an accident report with Oasis concerning the Kronberg incident.

Mr. Kronberg's widow brought wrongful death and survival actions against Oasis Petroleum and RPM Consulting, among others. Mrs. Kronberg alleged that the defendants' negligence caused her husband's death. The district court granted summary judgment for Oasis and RPM Consulting, ruling that neither company owed Mr. Kronberg a duty of care under North Dakota law. Mrs. Kronberg dismissed her claims against the remaining defendants and now appeals the grant of summary judgment in favor of Oasis and RPM Consulting.

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Mrs. Kronberg and drawing all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law" based on the pleadings, affidavits, depositions, answers, and other record materials. Fed. R. Civ. P. 56(a), (c).

II.

A.

Mrs. Kronberg asserts that the companies owed her husband a duty of care under North Dakota law for several independent reasons. She first argues that Bader was an employee of Oasis and RPM Consulting, and that the companies were thus vicariously liable to persons injured because of Bader's alleged negligence. *See Zimprich v. Broekel*, 519 N.W.2d 588, 590-91 (N.D. 1994); *see also* N.D. Cent. Code Ann. § 3-03-09. Employers generally are not liable, however, for the negligent acts of independent contractors. *Doan ex rel. Doan v. City of Bismarck*, 632 N.W.2d 815,

822 (N.D. 2001). To determine whether an individual is an employee or independent contractor, North Dakota courts review all of the circumstances and ask whether the employer had the "right to direct or control the means and manner of performing the work." *Id.* at 821; *see Zimprich*, 519 N.W.2d at 591-92. Because undisputed evidence shows that the companies did not direct the means and manner of Bader's work, we agree with the district court that the record establishes as a matter of law that Bader was not an employee of Oasis or RPM Consulting.

The Oasis-RPM Consulting and RPM Consulting-Bader contracts contained terms that give an independent contractor "control over the method, manner, and operative details of its work." *See Rogstad v. Dakota Gasification Co.*, 623 N.W.2d 382, 387 (N.D. 2001); *Pechtl v. Conoco, Inc.*, 567 N.W.2d 813, 816-17 (N.D. 1997). Oasis's contract with RPM Consulting provided that RPM Consulting was an independent contractor and possessed "the authority to control and direct the performance and safety of the details of the work." RPM Consulting also agreed that its employees, and those of its subcontractors, were not Oasis's employees. Oasis, according to the contract, was "interested only in the results obtained." After reaching its agreement with Oasis, RPM Consulting made a contract with Bader. This agreement provided that RPM Consulting was to "have no direction or control" over Bader, "except in the results to be obtained." The RPM Consulting-Bader contract referred to Bader as an independent contractor, and Bader disclaimed he was RPM Consulting's employee.

Undisputed testimony paralleled these contractual provisions. The three subcontractors whom RPM Consulting assigned to Nabors Rig 177 testified that neither Oasis nor RPM Consulting issued day-to-day instructions. Bader could perform his duties as he saw fit. Bader's work required a special skill set, and Oasis and RPM Consulting were not in the business of drilling oil wells. *See Newman v. Sears, Roebuck & Co.*, 43 N.W.2d 411, 414-15 (N.D. 1950).

Mrs. Kronberg contends nonetheless that Bader was Oasis's employee because he was the company's lone representative at the well, and he was required to complete an accident report about Mr. Kronberg's death on an Oasis company form. But these circumstances are not inconsistent with Bader's retention of control over his work. If Oasis had no employees at the well on a regular basis and no employees who had knowledge about the well, then it could not direct Bader's actions. *See id.*; *see also Pechtl*, 567 N.W.2d at 817. Calling for Bader to fill out an accident report provided by Oasis shows that the company wanted to know about the incident, but it does not support a finding that Oasis controlled the means and manner of Bader's work as company hand.

As to RPM Consulting, Mrs. Kronberg argues that the company controlled Bader's work in multiple ways: (1) the RPM Consulting-Bader contract required Bader to complete his work personally; (2) RPM Consulting assigned Bader to a specific rig; (3) RPM Consulting provided Bader with documents; (4) Bader e-mailed RPM Consulting employees often; (5) Bader sent daily progress reports to RPM Consulting employees; (6) RPM Consulting furnished equipment, such as a computer, along with an e-mail address and computer files for Bader's use; and (7) Bader was paid based on the number of days he worked and on a regular basis. For the reasons discussed below, these several circumstances are insufficient to support a finding of an employer-employee relationship between RPM Consulting and Bader.

A no-assignment clause in the RPM Consulting-Bader contract forbade Bader to assign or sublet any part of the contract without RPM Consulting's permission, but it did not require Bader to perform his work personally as would an employee. Other provisions of the contract referred to Bader's "personnel" and his "employees and agents," thus contemplating that Bader could have others work for him. The no-assignment clause merely prevented Bader from assigning his responsibilities to someone not under his control without RPM Consulting's consent. *See Robb v. United States*, 80 F.3d 884, 892 (4th Cir. 1996).

Although RPM Consulting assigned Bader to Nabors Rig 177, that assignment did not prohibit Bader from performing his job as he wished. *See Pechtl*, 567 N.W.2d at 817. Bader decided how to drill the well, and the two company hands enjoyed discretion to amend their work schedules. Mrs. Kronberg points out that both RPM Consulting and Bader could terminate their relationship at any time without penalty. But that circumstance is consistent with Bader working as either an employee or an independent contractor. In light of other evidence showing an independent contractor arrangement, termination rights alone do not establish a genuine issue of material fact about the nature of the relationship.

None of Bader's correspondence with RPM Consulting demonstrates that RPM Consulting controlled Bader. RPM Consulting sent Bader a plan that set forth the parameters for the well and documents that provided information about the geology and structure of the well. Bader exchanged numerous emails with RPM Consulting employees, many of which contained his invoices, time sheets, and morning reports. But Bader remained free to use his expertise to select his own approach to drilling the well. *See Schlenk v. Nw. Bell Tel. Co.*, 329 N.W.2d 605, 613 (N.D. 1983). None of the e-mails from RPM Consulting directed Bader to take a specific course of action or otherwise showed control by the company over Bader's work. RPM Consulting's request to receive progress reports from Bader each morning gave it only a general right to confirm that Bader was properly performing under the contract, and did not create an employer-employee relationship. *See Zimprich*, 519 N.W.2d at 593-94.

RPM Consulting's provision of equipment to Bader also does not support a finding of control. *See Kristianson v. Flying J Oil & Gas, Inc.*, 553 N.W.2d 186, 190 (N.D. 1996). Mrs. Kronberg argues that RPM Consulting directed Bader's use of the equipment for progress reports. But because RPM Consulting had the right to receive such reports from its independent contractor, it could tell Bader how to transmit the reports without controlling the means and manner of Bader's work as company hand.

RPM Consulting's payment structure fails to demonstrate the company's control of Bader. RPM Consulting paid Bader for each day he worked, but Bader did not receive an IRS Form W-2 for services provided by an employee, and RPM Consulting did not withhold taxes from Bader's checks. RPM Consulting provided no fringe benefits or insurance for company hands. *See Kirk v. Harter*, 188 F.3d 1005, 1008 (8th Cir. 1999); *Zimprich*, 519 N.W.2d at 591-92. Although RPM Consulting paid Bader on a regular basis when he submitted invoices, there is no evidence that RPM Consulting controlled the method, manner, or operative details of Bader's work through this practice. We therefore conclude as a matter of law that Bader was an independent contractor.

Mrs. Kronberg argues alternatively that the companies may be liable under the doctrine of retained control. This doctrine applies when a company treats an independent contractor like an employee, by controlling the "method, manner, and operative detail" of a specific portion of the contractor's work. *Doan*, 632 N.W.2d at 822. Under those circumstances, the company may be liable directly for the negligence of the contractor if it fails to exercise its control with reasonable care. *Id.*; Restatement (Second) of Torts § 414 (1965). But companies concerned with only the finished results of the contractor's work will not be held liable pursuant to the doctrine. *Schlenk*, 329 N.W.2d at 612.

Mrs. Kronberg asserts that Oasis controlled Bader by mandating that he select third-party vendors from a vendor list that Oasis provided. The list in question included third parties that complied with Oasis's standards; company hands could select any of those vendors to provide services at the company's wells. According to Bader, however, he chose vendors without Oasis's approval, and the company did not require adherence to the list at the time of the accident. In any event, even if Bader was required to obtain Oasis's permission before hiring certain vendors, that is not enough to establish actual control by Oasis. Oasis's right to specify quality vendors instead ensured that the "final results were in accord" with its plans. *Schlenk*, 329

N.W.2d at 612-13; *see Kristianson*, 553 N.W.2d at 189. Mrs. Kronberg also cites to Oasis's alleged control over the land where the Ross well was located, but such control does not demonstrate that Oasis controlled the "operative details" of Bader's work. The evidence thus does not support a finding that Oasis retained control of a specific portion of Bader's work.

As to RPM Consulting, Mrs. Kronberg relies principally on the Subcontractor Agreement to assert that the company maintained control over Bader's work on safety practices. The Agreement provided that Bader must "comply with standard safety practices, any OSHA requirements applicable to [his] work and any safety practices required by RPM and/or RPM's customers." But the contract also states that RPM Consulting "shall have no direction or control" of Bader. Because the Agreement unambiguously gives Bader the right to control the method and manner of work, the provisions regarding safety did not give RPM Consulting control over such matters. The cited language on safety practices is more appropriately characterized as relating to RPM Consulting's "right to make certain that the results obtained conformed to the specifications and requirements of the contract." *Schlenk*, 329 N.W.2d at 613; *see Zimprich*, 519 N.W.2d at 593-94.

Mrs. Kronberg argues that RPM Consulting actually exercised control of safety practices by offering safety training to company hands. RPM Consulting, however, did not require company hands to complete the training. Undisputed testimony, moreover, showed that RPM Consulting had no safety requirements in place at the time of Mr. Kronberg's death. As there is no genuine issue of material fact as to RPM Consulting's lack of control over Bader's safety practices, RPM Consulting owed no duty to Mr. Kronberg under the doctrine of retained control. Thus, neither company may be held liable for Bader's alleged negligence as a company hand.

B.

Mrs. Kronberg next contends that Oasis owed her husband a duty of care under North Dakota premises liability law. For Oasis to be held liable on this theory, Mrs. Kronberg must show that Oasis had "control over the property where the injury occurred" and "an opportunity to observe" the hazardous condition that caused her husband's death. *Saltsman v. Sharp*, 803 N.W.2d 553, 559 (N.D. 2011).

The record does not support a finding that Oasis controlled the property and had an opportunity to observe dangerous conditions at the well. Oasis contracted with other entities that managed the well's operations. Oasis owned no equipment at the well, and none of its employees worked at the well on a regular basis. *See Twogood v. Wentz*, 634 N.W.2d 514, 518 (N.D. 2001). Nabors Drilling, not Oasis, owned the metal grate and the generator that electrified the cord that caused Mr. Kronberg's death. Nabors Drilling employees completed the wiring of the electrical transformer and the generators needed to power the change shack and other structures at the well. Nabors Drilling employees also led well safety meetings. Nabors Drilling was the entity fined for violating Occupational Safety and Health Administration regulations in connection with Mr. Kronberg's death. On this record, there is insufficient evidence to support a finding that Oasis owed a duty of care to Mr. Kronberg under premises liability law.

C.

Mrs. Kronberg's final argument is that Oasis had a duty to provide an automated external defibrillator at the well. There was no defibrillator at the well on the date of Mr. Kronberg's death, and no North Dakota statute required the company to provide one. Mrs. Kronberg suggests that entities like Oasis should have a common law duty to make a defibrillator available.

In the absence of North Dakota law on the question, we are not prepared to predict that the North Dakota Supreme Court would adopt the proposed common law duty. The appellate courts of several jurisdictions have declined to hold that a business establishment has a common law duty to maintain an automated external defibrillator on its premises. *See, e.g.*, *Verdugo v. Target Corp.*, 327 P.3d 774, 793-94 (Cal. 2014) (listing cases); *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 561-62 (Fla. Dist. Ct. App. 2008); *Boller v. Robert W. Woodruff Arts Ctr., Inc.*, 716 S.E.2d 713, 715-16 (Ga. Ct. App. 2011); *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1220, 1222-25 (Pa. 2002). *But cf. Aquila v. Ultimate Fitness*, No. CV085017159S, 2011 WL 2611820, at *3-4 (Conn. Super. Ct. June 15, 2011) (ruling that record presented a genuine issue of material fact as to whether fitness company breached a duty of care to business invitee by failing to own an automated external defibrillator and have staff trained in its use). We are persuaded by the reasoning of the California Supreme Court that the numerous factors that bear on whether a duty should be imposed on businesses are best suited to legislative evaluation and line-drawing. *Verdugo*, 327 P.3d at 792-93.

\* \* \*

For these reasons, the judgment of the district court is affirmed.

_____